In the Matter of TUCKER CORPORATION, Debtor.

Boyd VEENKANT and Clyde O. Bates, Appellants,

v.

Nathan YORKE, Trustee of Tucker Corporation, Debtor, Appellee.

No. 12253.

United States Court of Appeals
Seventh Circuit.

June 25, 1958.

Leo J. Powers, Theodore W. Miller, Chicago, Ill., Joseph W. Boyd, Chicago, Ill., Powers & Boyd, Chicago, Ill., of counsel, for appellants.

Norman H. Nachman, Chicago, Ill., Louis W. Levit, Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and PARKINSON, Circuit Judges.

DUFFY, Chief Judge.

Tucker Corporation was organized in July, 1946, under the laws of the State of Delaware for the purpose of manufacturing motor vehicles. On January 27, 1947, appellant Bates entered into a written agreement whereby Tucker "* * * agrees to sell and Dealer (Bates) hereby agrees to purchase a Tucker Dealer Franchise which will entitle Dealer to sell at retail Tucker motor vehicles manufactured by the Company in the following described territory: * * *". Bates agreed to pay $4,000 for the franchise. He paid $2,000 down and executed a promissory note payable to Tucker for the balance. Subsequently, Bates paid $1,500 on account of the note indebtedness.

On May 23, 1947, appellant Veenkant entered into a similar written agreement whereby he agreed to purchase a Tucker franchise for certain described territory for the price of $4,000. Veenkant paid the purchase price in full.

On November 22, 1948, an involuntary petition in bankruptcy was filed against Tucker Corporation, and on November 26, 1948, there was filed an involuntary petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S. C.A. § 501 et seq. The two proceedings were consolidated under Chapter X on December 29, 1948. At the time of filing the bankruptcy and reorganization proceedings, Tucker Corporation had not proceeded sufficiently with the manufacture of automobiles so as to enable it to deliver Tucker automobiles to any Tucker dealers including appellants.

Asserting fraud and failure of consideration, the various franchise holders, including claimants herein, filed claims against Tucker Corporation in the reorganization proceedings. Amended claims were filed by claimants Veenkant and Bates with the understanding that these two claims would be test cases, and the decision herein would be binding as to other like claims represented by the same counsel. There are more than a hundred of such claims.

The Trustee moved to dismiss the two claims on the ground that they did not state a claim upon which relief could be granted, and because the allegations as to fraud were vague and not stated with the particularity required by Rule 9, Federal Rules of Civil Procedure, 28 U.S.C.A. As to Bates, the Trustee filed a counterclaim based on the unpaid balance of $500 on the note which Bates gave to Tucker as part of the payment required by his franchise agreement. The District Court entered an order dismissing the claims, and awarded the Trustee judgment for $500 on his counterclaim based upon the unpaid balance of Bates' note.

The Dealer franchise agreement which Veenkant and Bates each signed, contained, among others, the following provisions:

"2. Dealer agrees to pay to the Company at the time this agreement is executed the sum of $4,000.-00, as and in full payment of the purchase price of the aforementioned Tucker Dealer Franchise. Dealer agrees that said sum is the purchase price of this Tucker Dealer Franchise and that it has no claim for the return of all or any part of this sum and states that no representations to the contrary have been made to it.

"3. Dealer's quota of motor vehicles under this Tucker Dealer Franchise for the territory described in paragraph one (1) above, is hereby established as 200 for the first two years from the date of the delivery of the first motor vehicle under this agreement. The Company in no way guarantees that the quota established herewith will be delivered to Dealer during the above-mentioned two-year period, but the Company will exert its best efforts to fulfill or exceed such quota. Dealer agrees that the Company will not be liable for any failure on the part of the Company to deliver all or any part of such quota.

"8. This Tucker Dealer Franchise Agreement supersedes and cancels any and all prior agreements, verbal or written between Dealer and the Company, and it shall remain in full force and effect for a period ending two years after the date of delivery of the first Tucker Motor vehicle under this agreement, unless it is cancelled or superseded by a new agreement."

No plan of reorganization has been filed and none is contemplated. The assets of Tucker have been largely liquidated. Management engineers filed a report with the District Court on August 4, 1949, advising that in excess of $71,000,000 would be required to get into manufacturing operation with production at the rate of 60,000 automobiles per year as had been planned. Claimants allege that at no time did Tucker have more than $22,000,000 available.

Claimants contend that Tucker Corporation made fraudulent or false pretenses respecting its ability to manufacture and produce the Tucker automobile. The specific fraud relied upon is that the Tucker Corporation, through its publicity and advertisements in newspapers and magazines, represented that it was then in a position to bring forth the Tucker automobile, whereas those in charge of Tucker's affairs knew, or should have known, that the funds available to Tucker were entirely insufficient to do so. In the alternative, claimants seek recovery on the ground that when Tucker's finances failed, it was no longer in a position to manufacture Tucker automobiles; that claimants were thereby excused from performance under the contract and are entitled to a return of the price paid. Claimants also contend that Tucker purchased all of the capital stock of Air-Cooled Motors Corporation for the purchase price of $1,500,000, and that they are entitled to a lien upon such stock by virtue of a constructive trust created by law.

It must be conceded that the allegations of fraud in the two amended claims

are stated in general terms and also contain various conclusions. Claimants' counsel admits that a clear and more concise statement might ordinarily be desirable, but insists that as the decision herein will be binding on more than one hundred other similar but not necessarily identical claims, a more detailed statement was not practical.

While fraud must be alleged with particularity under Rule 9(b), Federal Rules of Civil Procedure, it is only necessary to allege ultimate facts and not evidence. All pleadings should be construed to do substantial justice. Pleadings in bankruptcy often are not as formal as in other types of litigation. The Trustee did not make a demand for a more particular statement. We think no one was misled as to the issues which the claimants were tendering. The claims herein should not be dismissed solely due to the manner in which they were stated. Whether the allegations of fraud are sufficient to state a claim upon which relief can be granted, in the light of the record before us, is, of course, a different question.

Obviously, the appellants knew that Tucker was a newly organized manufacturing company. Yet, within approximately six months of the date when the Articles of Organization were filed, Bates signed an agreement for a franchise. About four months thereafter Veenkant signed his agreement. As to the allegations of fraud, these are the significant dates and not the date when the involuntary petition in bankruptcy was filed which was approximately eighteen months after Veenkant signed his agreement. Irrespective of the provisions of the contract hereinafter discussed, the very basis for the charges of fraud must necessarily be that on January 27, 1947, in the case of Bates, and on May 23, 1947, in the case of Veenkant, Tucker knew or should have known that the financing then available to it or reasonably expected to become available, was entirely insufficient to enable Tucker to manufacture automobiles. The record shows that Tucker raised over twenty million dollars by the sale of its stock to the public, and it is alleged that it raised six million dollars additional from the sale of franchises. Tucker also sold accessories and made an endeavor to obtain a large loan from the Reconstruction Finance Corporation.

No automobiles available to the general public had been manufactured during the period of World War II. A terrific demand for new automobiles had been built up. Had Tucker been able to get into production while this demand continued, it is very likely each franchise would have become a valuable property right. There is no indication in the claims filed that either claimant was solicited personally to sign a franchise agreement. Their action came as a result of newspaper stories and advertisements which appeared in the early months after Tucker Corporation was organized.

There is no indication in the claims filed that Tucker Corporation did not honestly intend to use its best efforts to produce automobiles. No such claim has been made in the briefs or on oral argument. A valid charge of fraud by Tucker in January or May, 1947, cannot be based solely on the fact that an engineering survey made two years later showed that the management of Tucker had under-estimated its capital requirements. Nor is there any sound basis for a charge of fraud because the Tucker management may have been disappointed in financial help that had been expected. We hold the claims of Bates and Veenkant did not adequately allege a claim based on fraud.

As an alternative, claimants assert that as no automobiles were produced by Tucker, they were relieved from the obligation of carrying out their respective contracts. On this point, the trial court relied largely on provisions in the franchise agreements contained in paragraphs 2 and 3.

Paragraph 3 provided for a quota of 200 automobiles over a period of two

**812**

years. However, this paragraph also provided "The Company in no way guarantees that the quota established herewith will be delivered to Dealer during the above-mentioned two-year period, but the Company will exert its best efforts to fulfill or exceed such quota. Dealer agrees that the Company will not be liable for any failure on the part of the Company to deliver all or any part of such quota."

Paragraph 2 of the franchise agreement contained the following: "Dealer agrees that said sum is the purchase price of this Tucker Dealer Franchise and that it has no claim for the return of all or any part of this sum, * * *".

The language of these paragraphs is clear. Each claimant specifically agreed that the company would not be liable for any failure to deliver all or any part of the quota of Tucker automobiles. Each claimant also agreed that no part of the purchase price of the franchise was to be refunded.

When the agreements were signed at an early stage of the development of the Tucker Corporation, it seems quite clear that claimants entered into these agreements with their eyes open, and that the transaction was somewhat in the nature of a joint venture. If all went well, there were prospects of large profits. As it turned out, the venture failed.

We think the District Court was correct in dismissing the claims.

We must also uphold the action of the District Court in granting judgment for $500 on the counterclaim against Bates. The fact that he did not pay the purchase price in one sum, does not make him stand in a different category from those who did. He gave a promissory note and recognized its validity by renewing same and by making partial payments thereon. Harsh though it may seem, we think the District Court was correct in awarding a judgment for $500 on the counterclaim against Bates.

Affirmed.